United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 22, 1998 Decided July 28, 1998

 No. 97-3061

 United States of America, 

 Appellee

 v.

 Richard Paul Spinner, III, 

 Appellant

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 96cr00300-01)

 A.J. Kramer, Federal Public Defender, argued the cause 
and filed the briefs for appellant. Sandra G. Roland, Assis-
tant Federal Public Defender, entered an appearance.

 Michael Fitzpatrick, Assistant U.S. Attorney, argued the 
cause for appellee, with whom Wilma A. Lewis, U.S. Attor-
ney, John R. Fisher, Mary-Patrice Brown and Matthew L. 
Levine, Assistant U.S. Attorneys, were on the brief.


 Before: Edwards, Chief Judge, Sentelle and Garland, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Sentelle.

 Dissenting opinion filed by Circuit Judge Garland.

 Sentelle, Circuit Judge: Appellant Richard Spinner chal-
lenges his conviction on four weapons and narcotics charges. 
We agree with Spinner that the government introduced insuf-
ficient evidence to sustain his conviction for possession of a 
semiautomatic assault weapon, and accordingly reverse that 
conviction. And because the district court permitted the 
prosecutor to ask a defense witness a series of inappropriate 
questions on cross-examination, we reverse and remand Spin-
ner's conviction for possession with intent to distribute crack 
cocaine within 1,000 feet of a school. We affirm the remain-
ing convictions.

 I. Background

 A. The Offense

 On August 8, 1996, at approximately 4:00 p.m., Washington 
Metropolitan Police Department officers and FBI agents 
executed a search warrant at 636 46th Place, S.E., in the 
District of Columbia. Four people were present at the time: 
Richard Spinner, his mother, his 16-year-old sister, and his 
17-year-old cousin.

 The officers discovered three loaded guns during the 
course of their search. Two of them--a .380 caliber Colt 
semiautomatic pistol and a .45 caliber Sturm-Ruger semiauto-
matic pistol--were found under the cushions of a couch in the 
living room. The third gun, a Colt .223 caliber semiautomatic 
rifle, was found in the closet of a second-floor bedroom, inside 
a rifle case. During their search of that closet, the officers 
also recovered several .223 caliber magazines of ammunition, 
a bulletproof vest, and two ski masks. In addition, the 
officers found 1.279 grams of crack cocaine, packaged in 
multiple ziplock bags, in the living room and second-floor 
bedroom.

 The officers recovered documents relating to Spinner from 
the upstairs bedroom, including correspondence addressed to 
him; receipts bearing his name; his social security card; and 
a list--handwritten on an envelope bearing Spinner's finger-
print--of current prices for various quantities of crack co-
caine. Spinner's fingerprints were also found on two other 
noteworthy items: a .45 caliber bullet, which was inside the 
.45 caliber pistol; and a box of .44 caliber bullets found in the 
closet where the semiautomatic rifle was recovered. The 
officers also found two photographs that depicted Spinner in 
the upstairs bedroom.

 As a result of the officers' search, a federal grand jury 
returned a five-count criminal indictment against Spinner. 
The indictment charged Spinner with two counts of violating 
18 U.S.C. s 922(g)(1), which makes it illegal for a convicted 
felon to possess "any firearm or ammunition." (Spinner had 
a 1993 felony conviction for possession of a firearm with a 
removed, obliterated, or altered serial number in violation of 
18 U.S.C. s 922(k).) The indictment also charged Spinner 
with possession of a semiautomatic assault weapon, 18 U.S.C. 
s 922(v)(1); possession with intent to distribute cocaine base 
within 1,000 feet of a school, 21 U.S.C. s 860(a); and posses-
sion with intent to distribute cocaine base, 21 U.S.C. 
ss 841(a)(1) and 841(b)(1)(C). No charges were brought 
against Spinner's sister or his mother. However, Spinner's 
cousin was prosecuted in a separate proceeding in juvenile 
court.

 B. The Trial

 The government sought to prove that Spinner constructive-
ly possessed the recovered contraband. It argued that Spin-
ner had access to the upstairs bedroom, and the ability to 
control the contraband that was found there. In support of 
this position, it introduced into evidence Spinner's personal 
papers that were found in the bedroom, as well as the 
photographs depicting Spinner in the bedroom. To prove 
that Spinner possessed the contraband intentionally, the gov-
ernment stressed the presence of Spinner's fingerprints on 


the .45 caliber bullet, the box of .44 caliber ammunition, and 
the drug price list. It also introduced evidence of Spinner's 
"other crimes" pursuant to Federal Rule of Evidence 404(b) 
in order to show Spinner's intent to possess the contraband. 
In particular, the jury heard evidence that prior to his arrest 
Spinner had unlawfully possessed a semiautomatic handgun 
with an obliterated serial number, and that he had sold 25 
ziplock bags of crack to an undercover officer in front of the 
house at which the search warrant was executed.

 To make the case that the weapon recovered from the 
closet of the upstairs bedroom met the statutory definition of 
"semiautomatic assault weapon," the government introduced 
the testimony of Richard A. Turner, a firearms enforcement 
officer employed by the Bureau of Alcohol, Tobacco and 
Firearms. The district court permitted Turner to testify as 
an expert "concerning firearms, ammunition, identification, 
operation and design."

 The statutory term "semiautomatic assault weapon" in-
cludes:

 a semiautomatic rifle that has an ability to accept a 
 detachable magazine and has at least 2 of--

 (i)a folding or telescoping stock;
 (ii)a pistol grip that protrudes conspicuously beneath the action of the weapon;
 (iii)a bayonet mount;
 (iv)a flash suppressor or threaded barrel designed to accommodate a flash suppressor; 
 and
 (v)a grenade launcher.
18 U.S.C. s 921(a)(30)(B).

 In response to the prosecutor's questions, Turner described 
the recovered weapon, which is commonly called an AR-15 
rifle, as a "semiautomatic rifle which can accept a detachable 
magazine...." This testimony more or less tracks the statu-
tory phrase: "a semiautomatic rifle that has an ability to 
accept a detachable magazine." Next, the prosecutor asked 


Turner: "And what are the features, just in general, that 
would turn this [particular] weapon into a semiautomatic 
assault weapon?" Turner responded:

 Well, it has a telescoping shoulder stock. So that's one 
 feature. And then it has a pistol grip that extends 
 beyond the bottom of the receiver. . . . By having these 
 two features, it would put it into the classification of a 
 semiautomatic assault weapon.

(emphasis added). Here, Turner's language diverged from 
the language of the statute, which refers to a "pistol grip that 
protrudes conspicuously beneath the action of the weapon." 
The prosecutor did not ask Turner to explain what he meant 
by "receiver," nor did she ask him whether that term was 
equivalent to the statutory term "action." Nor indeed did she 
ask any follow-up questions about Turner's conclusion. And 
while the record makes it clear that Turner had the weapon 
at issue in front of him on the witness stand, it is not 
apparent whether he pointed to the "bottom of the receiver" 
as he spoke.

 Spinner's theory of the case was that he had not lived at 
the house for several months prior to his arrest, and that his 
cousin solely possessed the contraband. Both Spinner's cous-
in and his sister testified that the cousin had stayed in the 
upstairs bedroom frequently during the summer when Spin-
ner was arrested. The cousin testified that he had hidden the 
guns, drugs and ammunition in the house himself, hoping 
perhaps to sell them in the future.

 To establish that Spinner was not living at the house when 
the arrest took place, the defense called to the stand Spin-
ner's girlfriend, Lolita Little. On direct examination, Ms. 
Little testified that Spinner had moved in with her in late 
June 1996, approximately two months before Spinner's arrest. 
On cross-examination, the prosecutor asked her if "last May" 
she had been "upset that Richard Spinner was letting his 
friend use his mother's house to sell drugs." Defense counsel 
objected. At the bench, the prosecutor explained that her 
"good faith basis" for asking the question was a letter dated 
May 13, 1996, that Ms. Little had written Spinner when he 


was incarcerated for an unrelated crime. In pertinent part, 
the letter, with expletives deleted, said:

 I hope your thoughts be straight and stop those 
 m* * * * *f* * * * *s from using your mother and her 
 home to do this s* * * because you wouldn't do that in 
 their mother's s* * *, they wouldn't do that s* * * to 
 their mothers out of respect.

 The prosecutor explained that she intended to rebut the 
defense's suggestion in its opening statement that Spinner 
had "changed his life around" prior to "last May" by showing 
that Spinner had let his friend use his mother's house to sell 
drugs. She added that the defense is "asking the jury to 
believe [Spinner] changed his life and I think it's--the gov-
ernment should have the opportunity, first of all, for the jury 
to know what he was doing before this." She also argued 
that the challenged question was "entirely relevant to the 
government's argument that Mr. Spinner knew that [his 
cousin] was using, was selling drugs out of this premises." 
The defense objected to the question on the grounds that it 
was prejudicial, that it exceeded the scope of direct examina-
tion, and that it arguably constituted Rule 404(b) evidence for 
which the government did not provide sufficient notice.

 The trial judge said he would permit the prosecutor to 
pursue this line of questioning because it undermined the 
credibility of the witness; indeed, he even urged the govern-
ment to prosecute Ms. Little for perjury because he believed 
that the letter contradicted her earlier testimony. The judge 
also said that he would permit the prosecutor to proceed 
because the letter was evidence of Spinner's "other crimes, 
wrongs, or acts" under Rule 404(b) of the Federal Rules of 
Evidence because it related to his intent to distribute the 
narcotics seized from the house. The trial judge also found 
good cause to excuse Rule 404(b)'s requirement that the 
government provide reasonable notice of its intent to use the 
evidence, remarking that "when something arises in the de-


fense case that was unexpected, that's a basis to excuse 
pretrial notice."

 As the district judge was announcing this ruling, the law-
yers realized that the judge mistakenly believed that Ms. 
Little had testified that she had never seen drugs at the 
house or seen Spinner with drugs. The judge, it turns out, 
had confused Ms. Little with another witness who had so 
testified. When the lawyers pointed out the mistake, the trial 
judge nevertheless permitted the prosecutor to use the letter 
as a basis for cross-examination. (The letter itself was never 
admitted into evidence, and is not part of the record before 
us.)

 Responding to the prosecutor's questions, Ms. Little denied 
seeing drugs around the house, and denied that her letter to 
Spinner referred to drugs. She interpreted her letter to 
mean that she wished Spinner would stop people from "drink-
ing and cursing and laying up in his mother['s] house." The 
prosecutor also paraphrased a passage from the letter stating 
that Spinner "was no better than the friends that he let take 
advantage of his mother because he was greedy." Ms. Little 
denied that this passage referred to drugs. Finally, the 
prosecutor referred Ms. Little to a particular sentence of the 
letter, and asked: "Now, you were concerned in that sentence 
that if Mr. Spinner continued to do the s* * * that you 
referred to, he would end up locked up or dead, isn't that 
right?" Ms. Little assented, and reiterated that the refer-
ence to "s* * * " meant "cursing and drinking and laying 
around the house."

 The jury found Spinner guilty on all of the counts of the 
indictment. At the sentencing hearing, the district court 
dismissed Count Five (possession with intent to distribute 
cocaine) because it was a lesser included offense of Count 
Four (possession with intent to distribute cocaine within 1,000 
feet of a school). The district court sentenced Spinner to 92 
months of imprisonment on Counts One and Two (the felon-
in-possession counts) and Four, to be served concurrently. 
The court also imposed a 60-month concurrent sentence for 


Count Three, which was for possession of a semiautomatic 
assault weapon.

 Spinner filed a timely notice of appeal.

 II. Discussion

 A. Sufficiency of the Evidence

 Spinner argues that the evidence was not sufficient to 
support his conviction for possession of a semiautomatic 
assault weapon under 18 U.S.C. s 922(v). He avers that the 
government failed to prove that the AR-15 meets the statuto-
ry requirements for being a prohibited weapon. Citing Sta-
ples v. United States, 511 U.S. 600 (1994), he also argues that 
the government failed to meet its burden of proving beyond a 
reasonable doubt that he possessed the required mens rea for 
conviction. Staples clarified the government's obligation to 
prove that a defendant knew that a given firearm had the 
characteristics that brought it within the scope of the statute 
rendering possession of the weapon unlawful.

 1. Standard of Review

 Our standard of review depends on whether Spinner pre-
served these arguments by moving for judgment of acquittal 
pursuant to Federal Rule of Criminal Procedure 29. Our 
precedents recognize that a "broadly stated" motion for judg-
ment of acquittal "without specific grounds" is "sufficient to 
preserve [a] full range of challenges ... to the sufficiency of 
the evidence." United States v. Hammoude, 51 F.3d 288, 291 
(D.C. Cir. 1995); see also United States v. Milton, 8 F.3d 39, 
45 (D.C. Cir. 1993) (a "general claim of insufficient evidence" 
was sufficient to preserve a specific point of error not raised 
below). However, we review an appellant's sufficiency-of-the-
evidence challenge for plain error when a motion for judg-
ment of acquittal was based on specific (and different) 
grounds. United States v. Sayan, 968 F.2d 55, 62 (D.C. Cir. 
1992); see also United States v. White, 1 F.3d 13, 17 (D.C. 
Cir. 1993) (recognizing that sufficiency-of-the-evidence chal-
lenge would be reviewed for plain error if no motion for 

judgment of acquittal was filed with respect to the counts of 
appellant's conviction); but see United States v. Gjurashaj, 
706 F.2d 395, 399 (2nd Cir. 1983) ("[W]hen a defendant moves 
for acquittal, even without specificity as to the grounds, it is 
incumbent upon the government to review its proof as to the 
facts required to establish each element of each offense 
alleged.").

 Spinner moved for judgment of acquittal at trial. Address-
ing the semiautomatic assault weapon charge, his lawyer 
complained that "there has been no evidence submitted what-
soever to indicate any possessory interest of my client in that 
firearm." He explained to the district court that "there has 
been no testimony of [Spinner's] fingerprints [on the AR-15], 
any testimony of [Spinner's] prior contact [with the AR-15]." 
He did not, however, suggest that the government failed to 
shoulder its obligations under Staples, nor did he intimate 
that the government had fallen short of proving that the 
recovered weapon met the statutory test for unlawfulness. 
Because Spinner did not raise before the district court the 
specific arguments he raises before us, we review them for 
plain error under Sayan.

 Under Rule 52(b) of the Federal Rules of Criminal Proce-
dure, "[p]lain errors or defects affecting substantial rights 
may be noticed although they were not brought to the 
attention of the court." To be "noticed" under this rule, an 
error must be "plain" (or, in other words, "obvious") and 
"must have affected the outcome of the District Court pro-
ceedings." United States v. Clarke, 24 F.3d 257, 266 (D.C. 
Cir. 1994) (quoting United States v. Olano, 507 U.S. 725, 734 
(1993)). When reviewing a sufficiency-of-the-evidence chal-
lenge for plain error, we reverse only to prevent a "manifest 
miscarriage of justice." United States v. Jackson, 824 F.2d 
21, 26 (D.C. Cir. 1987) (quoting United States v. Baber, 447 
F.2d 1267, 1270 n.8 (D.C. Cir. 1971)). Such a miscarriage 
would exist "only if the record is devoid of evidence pointing 
to guilt, or ... because the evidence on a key element of the 
offense was so tenuous that a conviction would be shocking." 
United States v. Parker, 133 F.3d 322, 328 (5th Cir. 1998) 
(citation omitted); accord United States v. Wright, 63 F.3d 


1067, 1074 (11th Cir. 1995); United States v. Meadows, 91 
F.3d 851, 855 (7th Cir. 1996). It would be a manifest miscar-
riage of justice to let a conviction stand if the government 
failed to present any evidence on an essential element of the 
crime. Id.; see also Beckett v. United States, 379 F.2d 863, 
864 (9th Cir. 1967) (finding a manifest miscarriage of justice 
where "there was no proof of one of the essential elements" of 
the crimes charged).

 In White, we expressed uncertainty as to how a plain error 
review of a sufficiency-of-the-evidence argument might differ 
from the standard of review we apply when the argument has 
been preserved. 1 F.3d at 17. When applying the latter 
standard, we determine, after viewing the evidence in the 
light most favorable to the prosecution, whether "any rational 
trier of fact could have found the essential elements of the 
crime beyond a reasonable doubt." Id. (citing Jackson v. 
Virginia, 443 U.S. 307, 319 (1979)). That standard is itself 
"highly deferential." United States v. Lucas, 67 F.3d 956, 
959 (D.C. Cir. 1995). In White, we expressed difficulty in 
imagining a standard of review any more deferential than the 
Jackson standard. See 1 F.3d at 17; see also United States 
v. Pennington, 20 F.3d 593, 597 n.2 (5th Cir. 1994).

 In any event, we need not resolve whether, or in what 
respect, the plain error standard might differ from the Jack-
son standard in the context of a challenge to the sufficiency of 
the evidence supporting a conviction, because we hold that 
the government failed to present any evidence on an essential 
element of a crime for which Spinner was convicted. Such a 
lapse would warrant reversal under either standard. See 
Meadows, 91 F.3d at 855 n.6 ("[A] complete lack of any 
evidence of one of the essential elements of a crime is not 
only insufficient evidence, but too little evidence to avoid a 
manifest miscarriage of justice.").

 2. Did the Government Prove that the 
 AR-15 was a Prohibited Weapon?

 First, we address the government's efforts to prove that 
the recovered AR-15 met the statutory definition of a prohib-
ited semiautomatic assault weapon.

 It is axiomatic that the government bears the burden of 
proving all elements of a crime beyond a reasonable doubt. 
Indeed, the Due Process Clause of the Fifth Amendment 
"protects the accused against conviction except upon proof 
beyond a reasonable doubt of every fact necessary to consti-
tute the crime with which he is charged." In re Winship, 397 
U.S. 358, 364 (1970). Here, Spinner was convicted of violat-
ing 18 U.S.C. s 922(v)(1), which criminalizes the possession of 
a "semiautomatic assault weapon." A semiautomatic rifle, 
like that recovered from the upstairs bedroom in this case, is 
such an unlawful weapon if it is able to accept a detachable 
magazine and has at least two of the following features:

 (i)a folding or telescoping stock;
 (ii)a pistol grip that protrudes conspicuously beneath the action of the weapon;
 (iii)a bayonet mount;
 (iv)a flash suppressor or threaded barrel designed to
 accommodate a flash suppressor; and
 (v)a grenade launcher.
18 U.S.C. s 921(a)(30)(B). To obtain a conviction under 
section 922(v)(1), the government must prove beyond a rea-
sonable doubt that the recovered weapon satisfied the statu-
tory requirements. In addition, as we shall discuss below, it 
must also prove beyond a reasonable doubt that Spinner 
knew that the recovered firearm possessed the characteristics 
that brought it within the scope of the statute. See Staples v. 
United States, 511 U.S. 600, 619 (1994).

 The government sought to prove that the AR-15 possessed 
two (and only two) of the five enumerated statutory features, 
namely a "folding or telescoping stock," and a "pistol grip 
that protrudes conspicuously beneath the action of the weap-
on." It is undisputed that the government proved that the 
AR-15 was able to accept a detachable magazine, and that it 
possessed a "folding or telescoping stock." Therefore, the 
only issue here is whether the government has proved that 
the AR-15 possessed a "pistol grip that protrudes conspicu-


ously beneath the action of the weapon."1

 The government's expert on firearms testified that the 
AR-15 had a "pistol grip that extends beyond the bottom of 
the receiver." On appeal, the government has furnished us 
with a glossary published by the Associations of Firearms and 
Toolmark Examiners, which defines "receiver" as "[t]he basic 

________

 1In a footnote in its brief, the government halfheartedly suggests 
that the AR-15 possessed a "flash suppressor," another of the 
features listed in section 921(a)(30)(B). In support of this assertion, 
the government refers us to the testimony of James Cairnes, a 
government witness who was employed by a firearms manufacturer 
as a product safety and firearms control manager. When testifying 
about the AR-15, a weapon that was manufactured by his company, 
Cairnes referred to a part of the weapon as "this piece here." The 
following colloquy with the trial judge ensued:

 THE COURT:Which piece?
 MR. CAIRNS:This one.
 THE COURT:So the piece you're pointing to is at the front of the--at the very tip of the
 muzzle? You can't say this and that. You need to describe it so the court 
 reporter understands what you're
 talking about.
 MR. CAIRNS:I'll do my best, Your Honor. There's a flash suppressor attached to the--
 THE COURT:What did you call it?
 MR. CAIRNS:A flash suppressor. That's what I'm calling it. I don't know what this
 particular device is.
 THE COURT:Is that a term of art?
 MR. CAIRNS:Yes, it's either a flash suppressor or a compensator of some sort. I have
 not seen this particular kind of device on the end. So maybe I'm wrong in 
 giving it a name at all.
(emphasis added). Even putting aside the fact that the government 
never argued at trial that the AR-15 possessed a flash suppressor, 
this equivocal testimony is clearly insufficient to prove beyond a 
reasonable doubt that the AR-15 possessed that statutory charac-
teristic. 


unit of a firearm which houses the firing and breech mecha-
nism and to which the barrel and stock are assembled." It is 
telling, we think, that the government has submitted a techni-
cal publication to explain the meaning of the term "receiver." 
Turner clearly used the word as a term of art, and not in a 
commonly understood sense. Since the prosecutor never 
asked Turner to explain what he meant by "receiver," and 
never asked Turner whether "receiver" was equivalent to the 
statutory term "action," the jury was not given any evidence 
to support a conclusion that the AR-15 possessed "a pistol 
grip that protrudes conspicuously beneath the action of the 
weapon." 18 U.S.C. s 921(a)(30)(B)(ii). This evidentiary vac-
uum on a key statutory element requires that we reverse the 
conviction.

 The government argues that the jury had the opportunity 
to see for itself whether the AR-15 possessed the required 
statutory features. The jury, this argument goes, could have 
examined the gun during its deliberations, and seen that the 
pistol grip protruded "conspicuously beneath the action of the 
weapon." If the jury could have puzzled this out on its own, 
why would it matter that the testimony of the expert was 
deficient? In Meadows, the Seventh Circuit confronted a 
strikingly similar argument, and rejected it. 91 F.3d at 856. 
The weapon at issue in that case was a World War I era 
pistol or revolver that the defendant had modified by adding a 
stock that apparently enabled the weapon to be fired from the 
shoulder. Based on the testimony of an ATF expert that the 
weapon was unlawful, the defendant was convicted of possess-
ing a firearm that was made in violation of the provisions of 
26 U.S.C. s 5861(c). That statute defines the weapons it 
prohibits as follows:

 The term "rifle" means a weapon designed or redesigned, 
 made or remade, and intended to be fired from the 
 shoulder and designed or redesigned and made or re-
 made to use the energy of the explosive in a fixed 
 cartridge to fire only a single projectile through a rifled 
 bore for each single pull of the trigger, and shall include 


 any such weapon which may be readily restored to fire a 
 fixed cartridge.

26 U.S.C. s 5845(c) (emphasis added).

 At trial, the ATF expert did not define or explain the term 
"rifled bore." Meadows, 91 F.3d at 853. Referring to a 
dictionary definition, the Seventh Circuit explained that "the 
term 'rifled' is derived from the verb 'to rifle,' which means 
'to cut spiral grooves into the bore of (as a firearm or piece of 
ordnance)." Id. at 856 (quoting Webster's Third New Inter-
national Dictionary 1954 (1986)). The Meadows court con-
cluded that the absence of any testimony that the gun in 
question possessed a "rifled bore"--as well as the absence of 
any explanation as to what that term meant--was a fatal flaw 
in the government's case. Noting that the modified weapon 
at issue could well have had a smooth or a rifled bore, the 
court observed that "[t]here was no indication in the testimo-
ny that the bore was rifled, or that rifling was present in the 
bore." Id. at 857.

 On appeal, the government argued that, notwithstanding 
the lack of testimony concerning the rifled bore, the jury 
simply could have looked down the barrel of the weapon 
during its deliberations, and determined on its own whether 
the bore was smooth or rifled. This argument failed to 
persuade the Seventh Circuit. "[W]hy," asked the court, 
"would the jurors have bothered to look down the barrel to 
determine if the bore was 'rifled,' if they had no explanation 
of what 'rifled' meant?" Id. It continued: "We do not see 
why a jury would look for a feature of the weapon that 
neither the parties, the witnesses, nor the judge suggested 
that the jury should examine." Id. Accordingly, the Mead-
ows court concluded that there was "a complete gap in the 
evidence regarding this element." Id. 

 Since the defendant in Meadows had not preserved this 
objection by filing a proper motion for judgment of acquittal, 
the court applied a plain error standard of review. See id. at 
854-55. Stressing the government's failure to prove that the 
weapon had a rifled bore and its additional failure to prove 
that the defendant knew that the weapon had this feature 


that made possession unlawful, see Staples, supra, the court 
reversed, concluding that allowing the defendant's conviction 
to stand would amount to a miscarriage of justice. Id. at 857.

 Like the Seventh Circuit in Meadows, we also reject the 
government's argument that the jury, without any testimonial 
guidance, could have determined that the weapon satisfied 
the applicable statutory requirements. Granted, the jury in 
this case had the opportunity to examine the AR-15 during 
its deliberations. But without any explanation of the meaning 
of the statutory term "action," the jury had no evidentiary 
basis to conclude that the AR-15 met the statutory definition 
of a prohibited semiautomatic assault weapon. Indeed, not 
only was the term "action" never explained to the jury, the 
record reflects that the jury heard this term for the first time 
when the district court delivered its instructions.2

 3. Did the Government Prove the Required 

Mens Rea for Conviction?

 Spinner argues that even if the government had proved 
that the AR-15 was a prohibited semiautomatic weapon, it 
failed to prove that he possessed the required mens rea of 
section 922(v). In Staples v. United States, the Supreme 
Court held that under 26 U.S.C. s 5861(d), which prohibits 
the possession of an unregistered automatic firearm, the 
government must prove beyond a reasonable doubt that a 
defendant knew of the features of the weapon that brought it 
within the scope of the statute. 511 U.S. 600, 619 (1994). 
The government concedes that the rationale of Staples applies 

________

 2Although the government's closing argument could not have 
cured any evidentiary deficiencies in its case, we note that the 
prosecutor used neither the statutory term "action" nor the expert's 
term "receiver" in her summation. Rather, she used a third term, 
arguing that "this pistol grip ... protrudes out from underneath 
the frame of the weapon." "Action," "frame" and "receiver" may 
indeed be synonymous in this context. But without making it clear 
to the jury that these terms are synonymous, and indeed without 
defining any of them, the government left the jury without sufficient 
information to determine if Spinner had committed this crime. 

to section 922(v) as well. Thus, the government must prove 
that Spinner knew of the features of the AR-15 that brought 
it within the scope of section 922(v).

 Given our conclusion that the government failed to prove 
that the recovered weapon met the statutory definition of a 
forbidden semiautomatic assault weapon, it follows that the 
government similarly failed to prove beyond a reasonable 
doubt that Spinner knew that the AR-15 possessed the 
required statutory characteristics. Furthermore, although 
such knowledge "can be inferred from circumstantial evi-
dence, including any external indications signaling the nature 
of the weapon," Staples, 511 U.S. at 615-16 n.11, we think the 
circumstantial evidence that Spinner knew of the AR-15's 
statutory characteristics is very thin. When he was arrested, 
Spinner was in the kitchen. The AR-15 was found in a rifle 
case in a closet in the upstairs bedroom. The authorities 
discovered no fingerprints linking Spinner to the weapon or 
the ammunition inside it. Although the bedroom contained 
numerous documents bearing Spinner's name (all but one of 
them dated prior to the month of the arrest), it also contained 
documents bearing the names of three other family members. 
The government argues that "[t]he jury could have inferred 
that [Spinner] had an unusually strong interest in assault 
weapons based on the discovery in the [upstairs bedroom] of 
a magazine advertisement for an entire book about an assault 
weapon." But there was no evidence presented that Spinner 
had even seen this article. Finally, both Spinner's cousin and 
his girlfriend testified that Spinner had moved to his girl-
friend's house in June, 1996, two months before Spinner's 
arrest. Clearly, this evidentiary record falls far short of that 
in United States v. Moore, in which we found that evidence 
establishing that the defendant had handled a rifle and "was 
in continuous control of the weapon" was sufficient for a jury 
to conclude that the defendant had the requisite mens rea for 
possession of a sawed-off shotgun under 26 U.S.C. s 5861(d). 
97 F.3d 561, 563-64 (D.C. Cir. 1996).

 Given the complete lack of evidence in the record that the 
AR-15 possessed "a pistol grip that protrudes conspicuously 


beneath the action of the weapon," 18 U.S.C. 
s 921(a)(30)(B)(ii), as well as the paucity of evidence that 
Spinner knew that the weapon possessed the features that 
brought it within the scope of the statute, we conclude that 
Spinner's conviction on this charge was a manifest miscar-
riage of justice, and we reverse it.

 Because we reverse Spinner's conviction as a result of the 
insufficiency of the evidence supporting it, we need not pass 
on Spinner's argument that the jury instructions failed to 
explain the government's obligation to prove Spinner's mens 
rea under Staples. Nonetheless, in order to alert the district 
courts to this issue, we reproduce the jury instructions below:

 Count three of the indictment charges unlawful posses-
 sion of a semiautomatic assault weapon. The essential 
 elements of this offense ... are, one, that the defendant 
 possessed a semiautomatic assault weapon and, two, that 
 he did so knowingly and intentionally. A person, as I 
 have said, acts knowingly and intentionally if he's con-
 scious and aware of his act, realizes what he was doing 
 and does not act because of mistake, inadvertence or 
 accident. The term semiautomatic assault weapon 
 means a semiautomatic rifle that has an ability to accept 
 a detachable magazine and has at least two of the 
 following: [elements omitted]. It has to have at least 
 two of those.

As the government acknowledges, "at worst, the[se] jury 
instructions may have insufficiently explained the scienter 
requirement regarding the relevant features of the rifle." 
Without taking any position on whether these instructions 
would have survived our review of them for plain error, we 
encourage the district courts to explicitly instruct juries, 
when appropriate, that the government must prove that a 
defendant knew of the particular features of a weapon that 
rendered its possession illegal. See Staples, supra.

 B. Scope of Cross-Examination

 Spinner contends that the district court improperly permit-
ted the prosecutor to cross-examine his girlfriend, Lolita 

Little, about a letter Ms. Little wrote to Spinner two months 
before his arrest in this case. As we recounted above, the 
prosecutor asked Ms. Little if "last May" she had been "upset 
that Richard Spinner was letting his friend use his mother's 
house to sell drugs." The prosecutor based her question on a 
letter dated May 13, 1996 that Ms. Little had written to 
Spinner when he was incarcerated for an unrelated crime.

 Without referring to Rule 404(b), the prosecutor attempted 
to justify her questions by arguing that they were meant to 
rebut the defense theory of the case. She referred to the 
defense's opening statement in which, she claimed, counsel 
argued that Spinner "changed his life around" after his 
brother died in August of 1995. The letter showed--accord-
ing to the prosecutor--that "Mr. Spinner knew that [his 
cousin] was using, was selling drugs out of this premises" in 
May of 1996. In particular, the prosecutor argued that 
Spinner, while incarcerated, was "aiding and abetting" his 
cousin's drug dealing at his mother's house in May of 1996. 
Based on this evidence, the prosecutor argued that "Mr. 
Spinner was not a changed man."

 As we have noted, the government sought to use the letter 
to dispute that Spinner was a "changed man" who had 
"changed his life around" after his brother's death. Using 
the letter to paint Spinner as "greedy," and the kind of man 
who did nothing while "those m* * * * *f* * * * *s ... 
us[ed][his] mother and her home to do this s* * *," the 
government clearly hoped to use the letter to convince the 
jury that Spinner had not "changed his life around"; it hoped, 
that is, to show that Spinner remained a criminal after his 
brother died. Using evidence for this purpose is forbidden 
by Rule 404(b) of the Federal Rules of Evidence, which 
provides that "evidence of other crimes, wrongs, or acts is not 
admissible to prove the character of a person in order to show 
action in conformity therewith."

 We recognize that under Rule 404(b), "any purpose for 
which bad-acts evidence is introduced is a proper purpose so 


long as the evidence is not offered solely to prove character." 
United States v. Miller, 895 F.2d 1431, 1436 (D.C. Cir. 1990). 
Rule 404(b) itself lists permissible uses of such evidence: 
"proof of motive, opportunity, intent, preparation, plan, 
knowledge, identity, or absence of mistake or accident." In 
addition to arguing that the letter was intended to rebut the 
defense theory of the case--which, as we have explained, 
amounts to impermissible character evidence--the govern-
ment also said that the statements in the letter were relevant 
to the witness's credibility and bias. If the letter did under-
mine the witness's credibility, the government could be said 
to have asked its questions for a reason other than to show 
Spinner's character. See Miller, 895 F.2d at 1436 (using bad 
acts evidence to show character is "the one impermissible 
purpose for such evidence" under Rule 404(b)). Under these 
circumstances, Rule 404(b) would pose no barrier to admissi-
bility. The government, however, has not satisfactorily ex-
plained how the letter served to impeach Ms. Little. The 
prosecutor asked Ms. Little: "around the same time that you 
wrote this letter, you were also upset that Richard Spinner 
was letting his friend use his mother's house to sell drugs." 
But Ms. Little had not testified to the contrary when the 
prosecutor asked that question. Furthermore, we do not 
understand how Ms. Little's being upset under such circum-
stances would undermine her credibility at trial.

 Nor do we agree with the district court's conclusion (not 
urged by the government) that the statements in the letter 
would be admissible to show "intent" or "absence of mistake" 
under Rule 404(b). In reaching this conclusion, the district 
court apparently agreed with the government that "do[ing] 
this s* * * " meant drug dealing. But it seems just as likely 
to us that this reference is to using drugs as to selling them. 
Such a reading, we suppose, is equally consistent with the 
letter's conclusion that Spinner would "end up locked up or 
dead" if he continued to do this "s* * *." Nor is it apparent 
that this reference is to crack cocaine, the narcotic at issue in 
this case. Nor is it clear that the reference is to narcotics at 
all. Under these circumstances, the statements in the letter 

have virtually no bearing on whether Spinner possessed crack 
cocaine with the intent to distribute it in this case.

 Even if the government had questioned Ms. Little about 
the letter for a permissible purpose under Rule 404(b), it 
failed to provide "reasonable notice" to the defense of its 
intent to use the letter, as required by the rule. Rule 404(b) 
provides that "the prosecution in a criminal case shall provide 
reasonable notice in advance of trial, or during trial if the 
court excuses pretrial notice on good cause shown, of the 
general nature of any such evidence it intends to introduce at 
trial." Here, the district court, mistakenly thinking that the 
government had asked the pertinent question in order to 
impeach a perjurer, ruled that "notice was not required" 
because "something [arose] in the defense case that was 
unexpected...." But Rule 404(b) does not empower a dis-
trict judge to excuse the government from providing any 
notice that it intends to use bad acts evidence. That rule 
requires the government to "provide reasonable notice ... 
during trial if the court excuses pretrial notice on good cause 
shown...." The government provided no notice to the de-
fense, reasonable or otherwise, of its intention to question Ms. 
Little about the letter. Without approaching the bench, the 
prosecutor simply asked Ms. Little about Spinner's refusal to 
stop his friends from using his mother's house to sell drugs. 
On appeal, the government makes much of the fact that it had 
provided the letter to the defense during discovery. But 
providing such evidence to the defense in discovery is not 
enough to satisfy the notice requirements of Rule 404(b), 
which requires the government specifically to disclose "the 
general nature of any such evidence it intends to introduce at 
trial."

 For the reasons discussed above, we conclude that the 
district court abused its discretion when it permitted the 
government to question Ms. Little about the letter. See 
United States v. Graham, 83 F.3d 1466, 1473 (D.C. Cir. 1996). 
Furthermore, we cannot conclude that the admission of this 
testimony was harmless error. See United States v. Clarke, 
24 F.3d 257, 267 (D.C. Cir. 1994). In deciding whether error 


is harmless, we must "determine whether the error itself had 
a substantial influence on the verdict." Id. (internal quota-
tion marks and citations omitted). In other words, "we must 
determine with fair assurance that the judgment was not 
substantially swayed by the error." Id. (internal quotation 
marks, ellipses and citations omitted).

 The prosecutor emphasized the letter in her closing argu-
ment to the jury, suggesting to us that the letter may have 
had a "substantial impact" on the verdict. After summarizing 
the evidence against Spinner, the prosecutor concluded her 
remarks concerning Spinner's drug possession as follows:

 [Drug dealing] is what Lolita Little was referring to in 
 her letter as something that if he didn't stop it he would 
 get locked up or dead. And she suggested he had the 
 ability to stop it. He had the ability to stop his friends 
 from doing it. And he simply didn't. And that, ladies 
 and gentlemen, makes him guilty of possession with 
 intent to distribute crack cocaine within a thousand feet 
 of Davis Elementary School.

In addition, the government did not have an overwhelming 
case against Spinner for possession of the crack cocaine 
recovered in the house: no fingerprint evidence connected 
Spinner to the crack, nor was any of the crack recovered from 
his person or presence. Finally, we note that, although the 
district court gave the jury limiting instructions on other 
evidence introduced pursuant to Rule 404(b), it did not pro-
vide a similar limiting instruction for the statements in Ms. 
Little's letter, even though the court admitted them as "legiti-
mate 404(b) evidence," and characterized them as "clearly 
prejudicial" to Spinner. See United States v. Moore, 732 
F.2d 983, 990 (D.C. Cir. 1984) (limiting instruction lessens 
potential prejudice of bad act evidence).

 Because we conclude that it was not harmless error for the 
district court to permit the government to use the letter in its 
cross-examination of Ms. Little, we reverse Spinner's convic-
tion for possession with intent to distribute cocaine within 
1,000 feet of a school.


 III. Conclusion

 For the foregoing reasons, we reverse Spinner's convictions 
for possession of a semiautomatic assault weapon and posses-
sion with intent to distribute cocaine within 1,000 feet of a 
school, and remand for resentencing. Spinner has raised 
additional arguments. We have given them full consider-
ation, and determine that they warrant neither reversal of his 
remaining convictions nor discussion here. Accordingly, we 
affirm Spinner's convictions for possession of a firearm and 
ammunition by a convicted felon.

 Garland, Circuit Judge, dissenting in part:

 My colleagues reverse defendant Spinner's assault weapon 
conviction because they conclude that the evidence was insuf-
ficient to sustain the charge, and reverse his narcotics convic-
tion because they conclude that the district court permitted 
prejudicial cross-examination of Spinner's girlfriend. I dis-
agree with both conclusions and would affirm both convic-
tions.

 I. The Gun

 The majority holds the government's evidence insufficient 
on the assault weapon charge because they believe it "failed 
to present any evidence on an essential element" of the 
crime": to wit, that the AR-15 assault rifle possessed a 
"pistol grip that protrudes conspicuously beneath the action 
of the weapon." The government presented no evidence on 
this point, my colleagues say, because the government's ex-
pert failed to mention the word "action" during his testimony. 
But the expert's failure is beside the point. The government 
did not need an expert's testimony to establish this element 
because it had much better evidence: it had the gun itself.

 A photograph of the gun is attached to this opinion. See 
App. 1 (Gov't Ex. 48-C). Its "pistol grip" is quite prominent, 
and the majority does not suggest that the jury would have 
any trouble figuring out which part of the gun was the "pistol 
grip." Nor does the majority, or the defendant, contend that 
the word "conspicuously" was too vague for the jury to 
comprehend. Only the meaning of "action" is in dispute. 
But that dispute is simply irrelevant. The photograph clearly 
shows that the pistol grip protrudes conspicuously beneath 
every part of the weapon, whatever that part's name. Hence, 
even if the jury had no idea what the word "action" meant, as 
long as it understood the "action" to be a part other than the 
"pistol grip" itself, it is hard to see how a rational trier of fact 
could reach any conclusion other than that this element of the 
crime was satisfied.

 The majority's citation to the Seventh Circuit's opinion in 
United States v. Meadows, 91 F.3d 851 (7th Cir. 1996), does 


not support its conclusion, but the way in which that case 
differs from this one is instructive. First, there was no 
evidence in that case that the weapon at issue had a rifled, as 
compared to a smooth, bore--the key statutory feature. It 
was not just that the jury's attention had not been drawn to 
the issue. Even by the time of the appeal, the record did not 
indicate what kind of bore the weapon had. The court found 
that the weapon "may have contained either a smooth bore or 
a rifled bore," because "[t]he record nowhere indicates 
which." Indeed, "[t]he old pistol ... may well not have had a 
rifled bore." Id. at 857. That is not the case here. The 
attached photograph makes clear that the AR-15 did have the 
necessary element--a protruding pistol grip.

 Second, the Meadows court found that even if the weapon 
actually had a rifled bore, there was no way for the jury to 
know that without "look[ing] down the barrel." Id. Since 
the Meadows jury had no reason to know that looking down 
the barrel was important, the court found no reason to believe 
the jury would have "bothered" to do so. Id. But no such 
"bother" was required of Spinner's jury. The expert--what-
ever else his failings--held the gun up directly in front of the 
jury, and both the gun and the attached photograph (Appen-
dix 1) were admitted into evidence. As long as the jurors had 
their eyes open during either the testimony or their own 
deliberations, they necessarily would have seen the essential 
element.

 The majority also accepts Spinner's argument that even if 
the government did prove the AR-15 was a prohibited weap-
on, it failed to prove he had the required mens rea. As 
Staples v. United States, 511 U.S. 600 (1994), makes clear, 
and as the majority agrees, the government needed to prove 
only that Spinner knew the gun had the feature in question; 
it did not have to prove he knew the feature was illegal. See 
Bryan v. United States, 118 S. Ct. 1939, 1946 (1998). This 
means the government needed to prove only that Spinner 
knew the gun had a pistol grip protruding conspicuously 
beneath the action.


 How could the government meet that requirement? Surely 
it did not have to present evidence that Spinner was told the 
weapon's grip extended in that way. We do not expect 
defendants to have their own personal ATF experts on hand 
to advise them of their weapons' special features.1 Under 
Staples, the defendant's knowledge "can be inferred from 
circumstantial evidence, including any external indications 
signaling the nature of the weapon." Id. at 615 n.11. We 
held in United States v. Moore, 97 F.3d 561, 564 (D.C. Cir. 
1996), for example, that a defendant's knowledge that a 
sawed-off rifle was shorter than the lawful sixteen inches 
could be inferred from the fact that length is readily observa-
ble. No evidence that the defendant ever measured the 
weapon's 13-1/16-inch barrel was required, even though the 
difference between that and a 16-inch barrel is less than 
obvious to the naked eye. See also United States v. Foster, 
19 F.3d 1452, 1454 (D.C. Cir. 1994) ("The readily apparent 
barrel length and general appearance of the sawed-off rifle 
... are sufficient ... to establish that its owner knew the 
weapon needed to be registered...."). By contrast, the 
"external indication" of the nature of the AR-15 is obvious to 
the naked eye and no guesses about its specific length is 
required. Accordingly, the only question is whether Spinner 
ever saw or handled the gun.

 The majority suggests there was no such evidence. To be 
sure, there was no such direct evidence: no one testified to 
seeing Spinner with the gun. But the law has no preference 
for direct evidence over circumstantial, see Moore, 97 F.3d at 
564, and often it is the latter that is the more reliable. 
Courts regularly affirm murder and bombing convictions 
notwithstanding the absence of an eyewitness who saw the 
defendant shoot the gun or light the fuse. See, e.g., United 
States v. Kwong, 14 F.3d 189, 193-94 (2d Cir. 1994). Indeed, 

________

 1The jury could well have concluded that the defendant was 
something of a weapons expert himself. He previously had been 
convicted of illegal possession of a TEC-9 semi-automatic pistol, 
and the police found an advertisement for a book about assault 
weapons in a bedroom the jury rationally could have believed was 
his. See infra. 

in Moore we found sufficient proof that the defendant knew 
the sawed-off rifle was too short based on the fact that he had 
control of the weapon through constructive possession--even 
without evidence that he ever handled the weapon after it had 
been sawed off. Id. at 564. Here, too, the jurors could 
reasonably rely on a wealth of circumstantial evidence that 
Spinner saw or handled the weapon. See Staples, 511 U.S. at 
615 n.11.

 First, there was more than enough evidence for a reason-
able juror to conclude that a well-armed drug operation was 
based in Spinner's family home and employed the AR-15 in 
its work. The house was filled with all of the accoutrements 
of such an operation: semi-automatic weapons, magazines of 
extra ammunition, a bulletproof vest, two black ski masks, 
crack cocaine and ziplock bags. Moreover, a narcotics expert 
testified, based on the evidence recovered in the search, that 
the house was being used as a "stash house" from which 
narcotics sales were made. In such a business, the expert 
said, guns are used for intimidation and the maintenance of 
control. Given this evidence, the jury was entitled to con-
clude it was no coincidence that the AR-15 was in the house, 
and that instead it was an integral part of the business' 
armament.

 Second, there was more than enough evidence that Spinner 
was a participant in the drug operation, and that as such he 
would have handled or seen others handle the weapon. When 
the police entered the house, he was the only adult male 
present. His fingerprints were on a bullet inside a crack-
stained gun, on the container of a magazine of spare bullets, 
and on a list of current crack prices. Two undercover officers 
testified that they purchased twenty-five ziplocks of crack 
from him at the same house nine months before. The 
majority does not dispute the introduction of that evidence 
which, our cases hold, is probative of the fact that Spinner 
intended to possess and distribute the drugs found during the 
search, and tended to disprove his claim of mere innocent 
presence in the house.2 The jurors were also told that the 

________

 2See, e.g., United States v. Robinson, 59 F.3d 1318, 1322 (D.C. 
Cir. 1995); United States v. Johnson, 40 F.3d 436, 441 n.3 (D.C. Cir. 

defendant previously had unlawfully possessed a semi-
automatic weapon which, again, our cases hold "make[s] it 
less probable that the [weapons] found in the [house] ... 
were there by mistake or without [the defendant's] intent." 
United States v. Brown, 16 F.3d 423, 432 (D.C. Cir. 1994); 
accord United States v. Toms, 136 F.3d 176, 183-84 & nn.11-
12 (D.C. Cir. 1998). With this evidence, the jury could 
readily have concluded that as a player in the operation, 
Spinner would either have handled or seen others handle the 
AR-15. See Toms, 136 F.3d at 183 (evidence of participation 
in drug conspiracy sufficient for jury to conclude that defen-
dant had dominion and control over weapon not found on his 
person).

 Finally, there also was specific evidence that the assault 
rifle belonged to Spinner or was under his direct control. 
The gun was found in a half-opened case in an open closet in 
an upstairs bedroom. Whoever lived in that bedroom plainly 
had control over the contents of the closet. And there was 
plenty of evidence for a jury to conclude that the bedroom 
was Spinner's. The police found a photo of him lying on the 
floor of the bedroom with his feet resting in the open closet. 
Inside the bedroom were several letters to Spinner post-
marked in 1996, the last one dated just seven days before the 
search. Also in the bedroom were the kinds of personal 
identification a person needs for daily living, and that one 
would be unlikely to leave behind after moving out. These 
included Spinner's Social Security card, his check-cashing 
card, two medical assistance passes in his name, and a club 
membership card. (Spinner's current car registration was 
found in the living room.) Spinner's fingerprints were found 
in the bedroom--on a current list of crack prices. They were 
also found in the closet itself--on a container of ammunition 
placed right next to the half-opened case containing the 
AR-15.

 Our cases have repeatedly upheld jury findings of a defen-
dant's actual or constructive possession of an item of contra-
band based on far more tenuous evidence than that offered by 
______________________

1994); United States v. Clarke, 24 F.3d 257, 265 (D.C. Cir. 1994); 
United States v. Washington, 969 F.2d 1073, 1080-81 (D.C. Cir. 
1992). 

the government here.3 There is no reason to treat this case 
differently. Accordingly, I would conclude that the evidence 
was sufficient to show both that the AR-15 assault rifle had a 
conspicuously protruding pistol grip and that defendant knew 
it did.

 II. The Drugs

 My colleagues reverse the defendant's narcotics conviction 
on the ground that the district court abused its discretion by 
permitting cross-examination of Spinner's girlfriend about a 
letter she wrote him. The majority concludes the district 
court erred because the letter was not admissible as a prior 
"bad act" under Rule 404(b). The letter did not describe a 
prior bad act, the majority says, because it did not appear to 
refer to prior drug dealing at all. But even if the letter were 
admissible under Rule 404(b), the majority holds, the district 
court still erred in permitting cross-examination because the 
government failed to provide reasonable notice that it planned 
to do so.

 There is no need to address the question of whether the 
district court abused its discretion,4 because the kind of error 
________

 3See, e.g., Toms, 136 F.3d at 183-84 (evidence of prior drug 
dealing and that drugs were found in car was sufficient to prove 
that driver had constructive possession of weapon on seat of other 
occupant); In re Sealed Case, 99 F.3d 1175, 1179-80 (D.C. Cir. 
1996) (evidence that drugs were found near items tied to defendant 
was sufficient to establish actual or constructive possession); Unit-
ed States v. Fennell, 53 F.3d 1296, 1299-1300 (D.C. Cir. 1995) 
(evidence that defendants had keys and had just left apartment was 
sufficient to establish actual possession of contraband in apart-
ment); United States v. Harrison, 931 F.2d 65, 72-73 (D.C. Cir. 
1991) (evidence that defendant intended to distribute drugs was 
sufficient to prove defendant had constructive possession of guns 
found on other occupants of car); see also United States v. Jackson, 
124 F.3d 607, 610-11 (4th Cir. 1997) (evidence that firearm was 
stored at defendant's mother's home was sufficient to show con-
structive possession). 

 4The majority states that the government undertook the cross-
examination to rebut the defendant's claim that he had become a 

just described could not have been legally harmful to the 
defendant. To conclude that the error was harmful, and 
therefore grounds for reversal, we must conclude that it 
"affected substantial rights," Fed. R. Crim. P. 52(a). This 
"means that the error must have been prejudicial: It must 
have affected the outcome of the district court proceedings." 
United States v. Olano, 507 U.S. 725, 734 (1993). I cannot 
reach that conclusion here.

 If the majority is correct in its description of the letter, it 
can hardly have been harmful. According to the court, the 
letter created either no inference, or such a weak inference, 

________________________

"changed man" and no longer was involved in drug dealing. My 
colleagues say that permitting such a rebuttal was an abuse of 
discretion because it is barred by Rule 404(b) as an argument about 
the defendant's character: i.e., a contention that Spinner was not a 
changed man. But if Spinner actually had presented such a de-
fense, the government surely would have been permitted to rebut it. 
The Federal Rules of Evidence do not give defendants a free pass 
to present claims the government is barred from rebutting. If 
rebutting a "changed man" defense constitutes an effort to prove 
the defendant's character (and I am not sure that it does), then 
presenting such a defense must constitute such an effort as well. 
That is, by claiming that he is a changed man, Spinner must be 
claiming that he could not have committed the crime charged 
because he had changed his character and become law-abiding. 
But if that is his claim, then Rule 404(b) is not the rule that governs 
this case: Rules 404(a) and 405(a) are. And those rules permit the 
prosecution to cross-examine as to specific instances of past conduct 
in order to rebut a claim of good character advanced by the 
defendant. See United States v. Roper, 135 F.3d 430, 433 (6th Cir. 
1998); United States v. Moore, 27 F.3d 969, 974 (4th Cir. 1994); 2 
Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal 
Evidence s 404.11[2] (2d ed. 1998); 1 John W. Strong, McCormick 
on Evidence s 191 (4th ed. 1992).

 I do not dissent on this ground, however, because in fact the 
defendant never offered any evidence in support of a changed man 
defense. Defense counsel's opening statement did suggest that 
defense and indicated it would be proven through the testimony of 
defendant's mother. But Spinner's mother never testified and 
defense counsel did not return to the argument in his closing. 

of prior drug dealing that it could not be admitted under Rule 
404(b).5 It is not "at all apparent," the majority says, that 
the reference in the letter was "to crack cocaine.... Nor is 
it clear that the reference is to narcotics at all. Under these 
circumstances, the statements in the letter have virtually no 
bearing on whether Spinner possessed crack cocaine with the 
intent to distribute it in this case." But under these circum-
stances, the letter also could not have had a prejudicial effect. 
If the references were only to "drinking and cursing and 
laying up," as Ms. Little contended, it is hard to see what 
prejudicial impact they could have had in a case filled with 
evidence of crack cocaine and assault weapons and bulletproof 
vests.

 This conclusion is further bolstered by considering what 
actually transpired at the trial. The prosecutor asked Ms. 
Little whether certain phrases in her letter referred to drugs. 
The phrases themselves did not use the word. Ms. Little said 
no, repeatedly and adamantly. No other evidence as to the 
meaning of the letter was offered. Although the prosecutor 
did argue very briefly that the references must have been to 
drugs, the judge gave the usual limiting instruction that 
lawyers' arguments are not evidence and that the verdict 
must be based only on evidence. We have repeatedly said 
this kind of instruction can mitigate the impact of improper 

________

 5The inference would have to have been quite weak to justify the 
majority's determination that it was inadmissible on this score. All 
the government needed to prove with respect to probativeness was 
that " 'the jury could reasonably find the conditional fact--[here, 
that the defendant had engaged in drug transactions in the past]--
by a preponderance of the evidence.' " Clarke, 24 F.3d at 264 
(quoting Huddleston v. United States, 485 U.S. 681, 690 (1988)) 
(brackets in original). Thus, the majority's determination of inad-
missibility means the inference could not meet even that minimal 
threshold. Indeed, the majority's determination means the infer-
ence must have been even weaker than that. In order to reverse 
the trial judge's conclusion that the letter did show prior drug 
dealing, the majority had to find the inference so weak that the 
judge's conclusion was an abuse of discretion. See United States v. 
Graham, 83 F.3d 1466, 1473 (D.C. Cir. 1996). 

jury argument. See, e.g., United States v. Gatling, 96 F.3d 
1511, 1524 (D.C. Cir. 1996); United States v. Childress, 58 
F.3d 693, 716 (D.C. Cir. 1995). With this extraordinarily 
weak evidence, it is hard to see how the defendant could have 
been prejudiced.

 On the other hand, if a reasonable jury could have read the 
letter as referring to prior drug dealing by Spinner, then 
permitting the cross-examination was not error in the first 
place. If the letter did refer to prior drug dealing, it would 
have been admissible under Rule 404(b) to show Spinner's 
intent to possess and distribute the drugs found in the 
search--just as the district court held, see Trial Tr. 997-99 
(Feb. 10, 1997), and just as the prosecutor argued to the jury, 
Trial Tr. 1151 (Feb. 11, 1997). The majority does not dispute 
this, and a host of our cases so hold. See supra note 2.

 But, the majority contends, even if the cross-examination 
were permissible under Rule 404(b), the district court still 
abused its discretion because the government failed to give 
the defense "reasonable notice" of its intent to use the letter. 
Yet, a failure of notice alone cannot justify reversal. The 
defendant still must have suffered prejudice. See United 
States v. Perez-Tosta, 36 F.3d 1552, 1562 n.9 (11th Cir. 1994). 
Since this contention by the majority starts from the assump-
tion that the evidence was admissible under Rule 404(b), the 
prejudice could not have come from the failure to give the 
defendant more time to argue that the evidence was inadmis-
sible. Nor could the prejudice have come from defense 
counsel's lack of time to prepare the witness. What better 
answer could Miss Little have given to the government's 
pestering questions than the response she did give: "Not ... 
drugs.... I know nothing of drug things." In any event, 
although the government did not file a Rule 404(b) notice, the 
letter was hardly the "complete surprise" defense counsel 
claimed it to be since the government had given it to counsel 
during discovery.

 Finally, as against this extraordinarily weak evidence of 
prejudice--whether derived from the cross-examination itself 
or from the failure to give notice--we also must weigh the 


evidence arrayed against the defendant. Although the gov-
ernment's case may not have been "overwhelming," it did not 
have to be to establish harmless error. It only had to be 
strong enough to persuade us that whatever mild prejudice 
may have flowed from the cross-examination, it did not 
"substantially sway[ ]" the ultimate verdict. United States v. 
Clarke, 24 F.3d 257, 267 (D.C. Cir. 1994).

 The majority finds the government's evidence thin because 
"no fingerprint evidence connected Spinner to the crack." 
But while Spinner's fingerprints were not on the crack itself, 
they were on a list of current crack prices and on a bullet 
inside a crack-laced gun. And most of the crack itself was 
found inside the bedroom closet that appeared to be his. 
This, together with the other evidence recounted above, was 
strong evidence that Spinner was a member of the drug 
operation that used his mother's home as a "stash house." In 
any event, whatever inference of prior drug dealing the letter 
generated, it surely was weaker than, and "harmlessly cumu-
lative" of, see Clarke, 24 F.3d at 267, the much more direct 
evidence of Spinner's prior dealing properly admitted through 
the testimony of the two undercover officers who bought 
twenty-five ziplocks of crack from him.

 And against all of this, what was the defendant's theory of 
the case? It was that none of the contraband was his, and 
instead all belonged to his 17-year-old cousin, Darryl Henkle. 
Henkle did indeed testify that the guns, the drugs, the 
ammunition, and the other indicia of drug-dealing in the 
house were all his; that Spinner knew nothing of any of it; 
and that he had never, ever, seen Spinner with drugs. Hen-
kle came to court to testify against his own interests, he told 
the jury, in order "[t]o clear my cousin's name because he 
shouldn't have to go to jail for something that I did." Trial 
Tr. 868 (Feb. 10, 1997).

 This must have been quite a lot for any rational juror to 
swallow. The jury was advised that the 17-year-old previ-
ously had pled guilty in juvenile court to charges involving 
"possession of these firearms and the drug evidence in this 
case," had received a sentence of "house arrest and communi-


ty service," id., and could not "be further prosecuted," id. at 
949. Mr. Henkle, then, had nothing at risk and only his 
cousin to save by bravely taking all the weight upon himself. 
Moreover, Henkle was caught in a bold-faced lie while trying 
to do just that. He testified that he had found all of the guns 
in a car owned by Spinner's brother Robert, after Robert was 
shot to death in 1995, and that he had hidden them in the 
house without Spinner's knowledge. There was only one 
small problem: an official from the Sturm-Ruger Company 
testified that the Sturm-Ruger pistol found in the house had 
not even been shipped from the factory until two months 
after Robert was killed.

 The cross-examination which the majority and I have ad-
dressed at length took no more than a few minutes out of a 
week-long trial. It was one of dozens of such evidentiary 
rulings in the course of that trial. In recognition of the real-
life context in which such rulings are made, and the cost to 
the rule of law if every mistake required a retrial, we review 
such trial court decisions only for abuse of the court's discre-
tion. See, e.g., United States v. Graham, 83 F.3d 1466, 1473 
(D.C. Cir. 1996). Moreover, even where there is such an 
abuse, Federal Rule of Evidence 103(a) instructs us that 
"[e]rror may not be predicated upon a ruling which admits or 
excludes evidence unless a substantial right of the party is 
affected," and Federal Rule of Criminal Procedure 52(a) 
provides that "[a]ny error, defect, irregularity or variance 
which does not affect substantial rights shall be disregarded." 
See United States v. Russo, 104 F.3d 431, 434 (D.C. Cir. 
1997). Because Spinner's substantial rights were not affected 
by the cross-examination of his girlfriend, I would affirm his 
conviction for possession with intent to distribute crack co-
caine.

 Accordingly, I dissent from the majority's reversal of the 
two convictions discussed above, while concurring in the 
majority's affirmance of the remaining convictions.


 Appendix 1 (Gov't Ex. 48-C)

 [Appendix not available electronically]